**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF MARYLAND**
*Southern Division*

|  |  |  |
|---|---|---|
| | * | |
| TITAN INDEMNITY CO., | * | |
| Plaintiff, | * | |
| v. | * | Case No.: PWG-15-2480 |
| GAITAN ENTERPRISES, INC., *et al.*, | * | |
| Defendants. | * | |

\* \* \* \* \* \* \* \* \* \* \* \* \* \*

**MEMORANDUM OPINION**

This insurance-contract dispute arises out of the tragic June 2012 death of Fort Meyer Construction Corp. ("Fort Meyer") employee Leroy Cook in a vehicular accident at one of the company's asphalt plants. Cook died when a dump truck driven by Santos Sifredo Romero Garcia struck him. Garcia owns and operates trucking companies called A and S Trucking and Romero Santos Trucking. Marvin Gaitan owns and operates Gaitan Enterprises, Inc. and shares a truck parking lot with Garcia and other dump-truck contractors in Landover, Maryland.[1] Gaitan referred the Fort Meyer job to Garcia when he lacked a sufficient number of trucks to perform the work himself. Following the accident, Cook's estate and family members filed a tort suit in the Circuit Court for Prince George's County against Garcia, Gaitan, and their companies. Cir. Ct. Prince George's Cnty, Md. Second Am. Compl., J.A. 1–11, ECF No. 62.[2] Titan Indemnity Co. ("Titan"), which insures Gaitan, filed suit in this Court seeking a declaratory

---

[1] Throughout this Memorandum Opinion, "Gaitan" refers collectively to Marvin Gaitan and his company, while Garcia refers collectively to Santos Sifredo Romero Garcia and his companies.
[2] Citations to "J.A." refer to the Joint Appendix filed by the parties in the case.

judgment that it is not liable for any of the allegations in the state-court lawsuit and owes no duty to defend Gaitan in that case.  Compl., ECF No. 1.

Pending now before the Court is Titan's Motion for Summary Judgment.  ECF No. 60. The Motion has been fully briefed, *see* Pl.'s Mem., ECF No. 61; Defs.' Opp'n, ECF No. 63; Pl.'s Reply, ECF No. 66, and no hearing is necessary, *see* Loc. R. 105.6 (D. Md.).  Because I find that Garcia is not covered by the Titan Policy's temporary-substitution clause, I will grant Titan's Motion as to its liability and duty to defend under the Policy.  I also conditionally find that Titan has no duties or obligations under the MCS-90 endorsement attached to the policy because it only applies to entities insured by the underlying policy.  But because Titan did not raise this issue in its briefing, I will give the Defendants an opportunity to show cause within twenty-one days why summary judgment should not be granted in Titan's favor regarding the MCS-90 endorsement before rendering a final decision.

## Background

In reviewing a motion for summary judgment, the Court considers the facts in the light most favorable to the non-movant, drawing all justifiable inferences in that party's favor.  *Ricci v. DeStefano*, 557 U.S. 557, 585–86 (2009); *George & Co., LLC v. Imagination Entm't Ltd.*, 575 F.3d 383, 391–92 (4th Cir. 2009); *Dean v. Martinez*, 336 F. Supp. 2d 477, 480 (D. Md. 2004). Unless otherwise stated, this background is composed of undisputed facts.  *See Ricci*, 557 U.S. at 585–86; *George & Co.*, 575 F.3d at 391–92; *Dean*, 336 F.Supp.2d at 480.

For several years, Gaitan worked as a truck driver on site at Fort Meyer.  Gaitan Statement 13:2–10, J.A. 151.  In 2005, he opened his own business, *id.*, and Fort Meyer began using him as a point person for its hauling needs.  *See* Coppula Dep. 11:16–22, J.A. 63; Gaitan Statement 14:16–22, J.A. 152.  Whether Fort Meyer and Gaitan formalized this relationship in a

written contract is a subject of dispute.[3]  Coppula Dep. 26:1–10, J.A. 78; Gaitan Statement 13:15–21, J.A. 151; Gaitan Dep. Vol. I 14:11–14, J.A. 183.  Under this arrangement, Fort Meyer would tell Gaitan how many trucks it needed for each job, and Gaitan would either fill the request using his own fleet or refer work he could not perform to other contractors with whom he shared his parking lot.  Coppula Dep. 11:16–22, 29:18–30:8, J.A. 81–82; Garcia Dep. 18:12– 19:8, J.A. 117; Gaitan Statement 14:16–22, 16:2–6, J.A. 152, 154.  When Gaitan made referrals, drivers would submit to Fort Meyer a Gaitan work-order ticket, and Fort Meyer would pay Gaitan at an hourly rate for each submitted ticket; Gaitan, in turn, would pay the other contractors in full for their drivers' work, reserving only two to five dollars per job for processing costs.  Gaitan Statement 18:3–8, 21:3–13, J.A. 156, 159; Garcia Dep. 53:1–6, J.A. 125; Gaitan Dep. Vol. I 25:15–26:5, J.A. 185–86.  Gaitan shared neither the proceeds nor the expenses from referred trucking jobs with the other contractors, but benefitted by getting referrals from other contractors when they had excess work.  Gaitan Statement 21:14–22:6. J.A. 159–60; Gaitan Dep. Vol. II 20:2–6, J.A. 208.  Whatever the contractual relationship between Gaitan and Fort Meyer, it is undisputed that he exercised a degree of supervisory authority over the contractors to whom he referred work: verifying that they complied with Department of Transportation regulations; confirming that they met Fort Meyer's insurance requirements; examining drivers' driving records; and issuing IRS Forms 1099 to contractors.  Garcia Dep. 6:19–7:10, J.A. 114; Gaitan Dep. Vol I. 16:19–18:9, J.A. 183–84.  On any given day, Gaitan might refer multiple Fort Meyer jobs to other contractors.  *See* Gaitan Tickets, J.A. 248–72.[4]

---

[3] If a contract between Fort Meyer and Gaitan did exist, the Defendants did not include it in the summary judgment briefing materials.

[4] It is not entirely clear which contractor performed each job, but the tickets clearly show that drivers from Lucero's Trucking and EMM & OSK Trucking did work on May 29; from Canales Trucking on May 30; from A&S and Canales on May 31; and from Lucero's on June 1. It

On June 19, 2012, Fort Meyer called Gaitan with a job, but the parties dispute the number of trucks that Fort Meyer requested that day.   In his initial answers to interrogatories Gaitan indicated that Fort Meyer requested one truck, Gaitan Answers to Interrogs. No. 6, J.A. 133, but he later supplemented his answer and indicated the number was five, Gaitan Supp. Anwers to Interrogs. No. 6., J.A. 274–75, and he recalled the number as two in his deposition, Gaitan Depo. Vol. I 22:4, J.A. 185.   Whatever the number, Gaitan could not fill the request because one of his five trucks was in disrepair and—if Fort Meyer requested fewer than five trucks—because the others were on assignment elsewhere.[5]   Gaitan Depo. Vol. I. 22:4–11, J.A. 185; Gaitan Supp. Answers to Interrogs. No. 6, J.A. 274.   Instead, Gaitan referred the job to Garcia, one of the other contractors with whom he shared a parking lot in Landover, Maryland.   Garcia Dep. 20:15–21, 22:11–19, J.A. 117–18; Gaitan Dep. Vol. I 22:12–14.   Garcia took the job and used his own dump truck, Garcia Dep. 11:2–6, J.A. 115; Gaitan Statement 21:5–6; Gaitan Dep. Vol. II 13:12–17, which was minimally insured by a policy that he purchased from Progressive Casualty Insurance Company, Progressive Policy, J.A. 137.   While Garcia prepared the truck for loading at Fort Meyer, the truck in front of him pulled forward.   Garcia Dep. 29:13–30:1, 33:8–12, J.A. 119–20.   Without seeing Cook walking in front of the vehicle, Garcia also pulled forward, struck Cook, and killed him.   *Id.* 38:1–39:21.

---

appears that the other tickets, most of which are marked with the letter "G" followed by a number, were issued to Gaitan drivers.

[5] Gaitan did not mention the truck's state of disrepair in his 2013 Statement Under Oath, *see* Gaitan Statement, J.A. 139–76, or in his initial Answers to Interrogatories submitted in February 2016, *see* Gaitan Answers to Interrogs., J.A. 130–36.   It was not until his March 2016 deposition that he raised the matter, Gaitan Depo. Vol. I. 22:4–11, J.A. 185, and he reiterated it in his July 2016 Supplemental Answers to the Interrogatories, Gaitan Supp. Answers to Interrogs. No. 6, J.A. 274.   The Defendants have not produced any documentation of the breakdown.   *Id.* No. 13, J.A. 275–76.   But because the Defendants are entitled to all reasonable inferences in their favor at the summary-judgment stage, I will assume that the truck was out of service on the day of the accident.

Following the accident, Cook's estate and family members filed suit in the Circuit Court for Prince George's County against Garcia, Gaitan, and their companies, bringing wrongful-death and survival claims (Counts I and II) as well as negligence claims for Garcia's failure to obtain adequate insurance coverage and Gaitan's failure to ensure that he did so (Counts III and IV).  Cir. Ct. Prince George's Cnty, Md. Second Am. Compl.

## Standard of Review

Summary judgment is proper when the moving party demonstrates, through "particular parts of materials in the record, including depositions, documents, electronically stored information, affidavits or declarations, stipulations . . . , admissions, interrogatory answers, or other materials," that "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(a), (c)(1)(A); *see also Baldwin v. City of Greensboro*, 714 F.3d 828, 833 (4th Cir. 2013).  If the party seeking summary judgment demonstrates that there is no evidence to support the nonmoving party's case, the burden shifts to the nonmoving party to identify evidence that shows that a genuine dispute exists as to material facts.  *See Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 585–87 & n.10 (1986).  The existence of only a "scintilla of evidence" is not enough to defeat a summary judgment motion. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 251 (1986). Instead, the evidentiary materials submitted must show facts from which the finder of fact reasonably could find for the party opposing summary judgment.  *Id.*  A "genuine" dispute of material fact is one where the conflicting evidence creates "fair doubt"; wholly speculative assertions do not create "fair doubt." *Cox v. Cnty. of Prince William*, 249 F.3d 295, 299 (4th Cir. 2001); *see also Miskin v. Baxter Healthcare Corp.*, 107 F. Supp. 2d 669, 671 (D. Md. 1999). The substantive law governing the case determines what is material. *See Hooven–Lewis v. Caldera*, 249 F.3d 259,

265 (4th Cir. 2001). A fact that is not of consequence to the case, or is not relevant in light of the governing law, is not material. *Id.*; *see also* Fed. R. Evid. 401 (defining relevance).

**Discussion**

Under Maryland law, an insurance company has a duty to defend "if there is a potentiality that the claim could be covered by the policy." *Md. Cas. Co. v. Blackstone Int'l Ltd.*, 114 A.3d 676, 682 (Md. 2015).[6]  Determining whether a potentiality of coverage exists requires courts to examine two questions: "(1) what is the coverage and what are the defenses under the terms and requirements of the insurance policy? (2) do the allegations in the [underlying] tort action . . . potentially bring the tort claim within the policy's coverage?" *Id.* (quoting *Walk v. Hartford Cas. Ins. Co.*, 852 A.2d 98, 106 (Md. 2004)).

The Titan Policy does not list Garcia as an insured individual or his truck as a covered vehicle. *See* Business Auto Coverage Form Declarations 3–4, J.A. 18–19.  Defendants maintain, however, that Garcia's truck falls within the Policy's "temporary substitute" clause.  Defs.' Mem. 13–14.  If Garcia's truck is not covered as a temporary substitute, then Defendants argue that the Policy's MCS-90 endorsement requires Titan to pay for any judgement against Garcia, subject to indemnification. *Id.* at 15, 20.

Temporary-Substitute Clause

When construing an unambiguous contract, "courts focus on the four corners of the agreement[,] and ascribe to the contract's language its customary, ordinary, and accepted meaning." *Dynacorp Ltd. v. Aramtel Ltd.*, 56 A.3d 631, 670 (Md. Ct. Spec. App. 2012) (alteration in original) (citations and internal quotation marks omitted); *see also 100 Inv. Ltd.*

---

[6] The parties agree that Maryland law governs interpretation of the contract, except for the MCS-90 endorsement, which is required by the Motor Carriers Act of 1980, and is therefore governed by federal law.  Pl.'s Mem. 13; Defs.' Opp'n 11.

*P'ship v. Columbia Town Ctr. Title Co.*, 60 A.3d 1, 23 (Md. 2013). In these circumstances, the contract's construction is "an issue of law for resolution by the trial judge." *Bd. of Educ. of Charles Cnty. v. Plymouth Rubber Co.*, 569 A.2d 1288, 1296 (Md. Ct. Spec. App. 1990); *see also Pac. Indem. Co. v. Interstate Fire & Cas. Co.*, 488 A.2d 486, 489 (Md. 1985).   When, however, "there is a *bona fide* ambiguity in the contract's language or legitimate doubt as to its application under the circumstances . . . the contract [is] submitted to the trier of the fact for interpretation." *Plymouth Rubber*, 560 A.2d at 1296. Nonetheless, "[t]he court may construe an ambiguous contract if there is no factual dispute in the evidence." *Pac. Indem. Co.*, 488 A.2d at 489.   Contract language is ambiguous "if, to a reasonably prudent person, the language used is susceptible of more than one meaning and not when one of the parties disagrees as to the meaning of the subject language." *Id.*   With specific regards to temporary-substitute clauses, Maryland courts take an "[e]venhanded" approach to interpretation, neither "unreasonably extend[ing] [the provision] to increase materially the risk contemplated by the insurer" nor construing it overly narrowly "because the clause is designed for the insured's protection." *St. Paul Fire & Marine Ins. Co. v. Nationwide Mut. Ins. Co.*, 558 A.2d 1244, 1246 (Md. Ct. Spec. App. 1989).

The Titan Policy covers "sums . . . an insured legally must pay as damages . . . because of bodily injury or property damages . . . caused by an accident resulting from the ownership, maintenance or use of a covered auto."  Titan Policy § II.A., J.A. 21.  As an initial matter, Titan cannot be liable for Counts III or IV of the state-court Complaint, which seek damages from Gaitan and Garcia respectively for Garcia's failure to obtain adequate insurance.  Cir. Ct. Prince George's Cnty, Md. Second Am. Compl. ¶¶ 15–31, J.A. 6–10.  If proven, any damages alleged in those counts were caused by Garcia's failure to obtain more comprehensive insurance or

Gaitan's failure to insist that he do so, not by an accident involving a covered vehicle.   Thus, I need only consider whether Counts I and II are potential sources of liability for Titan.

For Titan to be potentially liable for either Count I or II, I must find that the accident involved a "covered auto" driven by an "insured" driver.   *See* Titan Policy § II.A., J.A. 21.   A driver is an "insured" only when the accident involves a "covered auto."   *See id.* § II.A.1, J.A. 21.   Beyond the enumerated vehicles that the Policy covers, the Policy's temporary-substitute clause defines as a "covered auto . . . [a]ny auto not owned by an insured while used with the permission of its owner as a temporary substitute for a covered auto . . . that is out of service because of its: a. Breakdown; b. Repair; [or] c. Servicing . . . ."   Titan Policy § I.D.3, J.A. 21.   The parties do not dispute the meaning of the word "substitute," as its meaning is unambiguous; rather they disagree about whether the largely undisputed facts establish that the clause was triggered.   Because one of the covered vehicles was out of service at the time of the accident, Defendants argue that Garcia's truck was a temporary substitute.   Defs.' Opp'n 13–14. Titan answers that the clause cannot apply because the truck was driven by Garcia and not Gaitan, one of his employees, or anyone "under the direction or control of Gaitan Enterprises at the time the accident."   Pl.'s Mem. 18.   Moreover, because, according Gaitan's deposition account, he sent two non-Gaitan trucks to Fort Meyer on the day of the accident, Titan argues that there is no basis for designating Garcia's truck the temporary substitute over the other truck. *Id.*

Adopting Defendants' interpretation of the temporary-substitute clause would dramatically expand liability in referral-reliant industries such as this one.   Whether Fort Meyer requested one, two, or five trucks from Gaitan and whether Gaitan's functioning trucks were on assignment elsewhere on the day of the accident are immaterial facts.   Had Gaitan's out-of-

service truck been available and dispatched to Fort Meyer on the day of the accident, Gaitan would presumably have received $228 for the work performed using the truck. *See* Garcia Dep. 50:21–51:5, J.A. 125 (indicating he got paid for four hours of work on the day of the accident); Gaitan Invoice, J.A. 245 (indicating $57 per hour rate). At most, Gaitan received five dollars for referring Garcia to Fort Meyer—just enough to cover paperwork costs. Garcia Dep. 51:15, 53:1–8, J.A. 125; Gaitan Dep. Vol. I 25:15–26:5, J.A. 185. If Garcia's truck were a substitute for Gaitan's out-of-service truck, it would have been used for the same purpose as the covered truck—generating revenue for Gaitan. Because the truck was not so used, but instead generated revenue *for Garcia*, it cannot be considered a "substitute." *See* Titan Policy § I.D.3, J.A. 21.

Moreover, regardless of how many referrals Gaitan made on the day of the accident, he frequently made more referrals than the number of Gaitan trucks that were out of commission. In the early days of his business, Gaitan would make as many as forty referrals on any given day. Gaitan Dep. Vol. I, 15:21, J.A. 183. On May 31, 2012—less than three weeks before the accident—both an A and S Trucking and a Canales Trucking driver submitted Gaitan tickets for work at Fort Meyer, but five Gaitan drivers also appear to have submitted tickets on the same day. Gaitan Tickets, J.A. 260–66. The record shows that referrals were a common practice for Gaitan and the dump-truck industry as a whole. Defendants' interpretation of the temporary-substitute clause would expand Titan's liability to a new vehicle essentially whenever one of Gaitan's covered vehicles happened to be out of commission. This interpretation would "unreasonably extend[]" the Titan Policy's coverage. *See St. Paul Fire & Marine Ins. Co.*, 558 A.2d at 1246. I therefore find that Garcia's truck was not a "covered auto" under the Policy. *See* Titan Policy § I.D.3, J.A. 21. For the same reason, Garcia was not an "insured" under the Policy. *See id.* § II.A.1, J.A. 21. Titan is entitled to summary judgment on the question of its liability

and duty to defend under the Policy.

MCS-90 Endorsement

> Congress enacted the [Motor Carrier Act of 1980], in part, to address abuses that had arisen in the interstate trucking industry which threatened public safety, including the use by motor carriers of leased or borrowed vehicles to avoid financial responsibility for accidents that occurred while goods were being transported in interstate commerce.

*Canal Ins. Co. v. Distrib. Servs., Inc.*, 320 F.3d 488, 489 (4th Cir. 2003).  Section 30 of the Act establishes a minimum insurance requirement for "motor carrier[s]" engaged in the interstate "transportation of property."  49 U.S.C. § 31139(b).  Motor carriers transporting non-hazardous property such as asphalt must demonstrate financial responsibility of at least $750,000.  *Id.* § 31139(b)(2); 49 C.F.R. § 387.9.  Purchasing an insurance policy with a MCS-90 endorsement is one of three ways by which a motor carrier can meet its obligations under the statute.  *See* 49 C.F.R. § 387.7(d)(1).  The endorsement provides:

> In consideration of the premium stated in the policy to which this endorsement is attached, the insurer (the company) agrees to pay, within the limits of liability described herein, any final judgment recovered *against the insured* for public liability resulting from negligence in the operation, maintenance or use of motor vehicles subject to the financial responsibility requirements of sections 29 and 30 of the Motor Carrier Act of 1980 regardless of whether or not each motor vehicle is specifically described in the policy and whether or not such negligence occurs on any route or in any territory authorized to be served by the insured or elsewhere.

Form MCS-90, J.A. 14 (emphasis added).[7]  The MCS-90 "creates a suretyship by the insurer to protect the public when the insurance policy to which the MCS-90 endorsement is attached otherwise provides no coverage *to the insured*."  *Canal Ins. Co.*, 320 F.3d at 490 (emphasis added).  As the parties acknowledge, the MCS-90, which is "a creature of federal statute and regulations[,] is governed by federal law."  *Forkwar v. Progressive Ins. Co.*, 910 F. Supp. 815,

---

[7] The endorsement is identical to the language provided in the regulations at 49 C.F.R. § 387.15, illus. 1.

825 (D. Md. 2012).

Titan argues that the MCS-90 does not apply because the accident did not occur while Garcia was engaged in interstate transportation of property because he was to deliver asphalt from the Fort Meyer plant in the District of Columbia to a site also in the District.  Pl.'s Mem. 27–28.  Not so, say the Defendants.  They urge the Court to reject a "trip-specific" interpretation of the MCS-90 and instead find the endorsement triggered any time a policyholder that sometimes engages in the interstate transportation of property gets into an accident.  Defs.' Opp'n 19–20 (citing *Royal Indem. Co. v. Jacobson*, 863 F. Supp. 1573, 1541 (D. Utah 1994) (holding that the MCS-90 endorsement applied to a covered truck hauling agricultural goods, which are exempted from Motor Carrier Act coverage, because the carrier hauled non-exempt goods at other times)).  Moreover, they argue that the endorsement is triggered even under a "trip-specific" analysis because Garcia's trip began with the dispatch of the truck from Landover, Maryland.  *Id.* at 17, 20.  Neither the Fourth Circuit nor this Court has addressed the scope of § 30's reference to interstate "transportation of property," and I do not find it necessary to do so today, as the matter can be addressed on contractual grounds.

Consistent with the "virtually unanimous" holdings of other federal courts, this Court has held "that the term 'insured' in the MCS-90 endorsement is limited to the insured named in" the underlying insurance policy to which the endorsement is attached.  *Forwkar*, 910 F. Supp. 2d at 825–26; *see also Daniel v. Nat'l Cas. Ins. Co.*, 125 F. Supp. 3d 355, 367 (D. Md. 2015).  In that case, the Court concluded, based upon findings by the Circuit Court for Prince George's County that were entitled to preclusive effect, that an MCS-90 endorsement did not make a motor carrier liable for an accident involving an independent contractor using his own truck, who the motor carrier did not dispatch.  *Id.* at 818–19, 828.  Having already found *supra* that Garcia—an

independent contractor not dispatched by Gaitan and using his own truck—was not an "insured" under the Titan Policy either as a named driver or even implicitly under the Policy's temporary-substitute clause, he cannot be deemed an "insured" under the MCS-90 endorsement.  *See Forkwar*, 910 F. Supp. 2d at 825–26.  Thus, the MCS-90 does not require Titan to pay for any damages arising out of the state-court lawsuit.

Accordingly, I conditionally find that Titan has no duties or obligations under the MCS-90. But because Fed. R. Civ. P. 56(f) entitles the Defendants to notice and an opportunity to respond before I grant summary judgment against them on a ground not raised by Titan, I will give the Defendants an opportunity to show cause why summary judgment should not be granted in Titan's favor on the MCS-90 issue.  They must do so within twenty-one days of the issuance of the accompanying Order.

<u>**Conclusion**</u>

Having found that Garcia's truck was not a "covered auto" under the Titan Policy's temporary-substitute clause and that Garcia was consequently not an "insured," I also conditionally find the Policy's attached MCS-90 endorsement inapplicable because it can only be applied to an "insured."  Titan is entitled to summary judgment as to its liability and duty to defend under the Policy; however, because I decided the MCS-90 issue on grounds not raised by Titan, the Defendants will first be permitted to show cause why summary judgment should not be granted to Titan on that issue.

A separate Order follows.

Dated: <u>November 14, 2016</u>                              <u>        /S/                    </u>
                                                                                    Paul W. Grimm
                                                                                    United States District Judge

jlb